IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **Taylor Building Corporation of America**, | : | Case No. 1:04cv510 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART AND |
| **Eric Benfield**, | : | DENYING IN PART DEFENDANT'S |
| | : | MOTION FOR SUMMARY |
| Defendant. | : | JUDGMENT |

This matter is before the Court on Defendant's motion for summary judgment (doc. 13),

Plaintiff's Memorandum in Opposition (doc. 15), and Defendant's Reply (doc. 18).  For the

reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's

motion.

I.      BACKGROUND

This lawsuit concerns whether Plaintiff corporation is entitled to damages from

Defendant because of Defendant's creation of a website containing material that allegedly

infringes upon Plaintiff's service mark and contains information that is false and defamatory to

Plaintiff.  (Doc. 1.)  Defendant asserts that Plaintiff's claims are barred by the protections

afforded to him by the First Amendment to the United States Constitution and counterclaims that

Plaintiff's initiation and prosecution of this litigation is tortious, entitling him to compensatory

and punitive damages.  (Doc. 3.)  Defendant has moved for summary judgment on each of

Plaintiff's three claims: libel, tortious interference with contract/business relations, and

misappropriation of service mark and trade dress.  (Doc. 13.)

Plaintiff Taylor Building Corporation of America ("Taylor") is in the business of residential construction. In the course of its business, Taylor occasionally constructs model homes for demonstrative purposes. In addition to allowing potential customers to enter and view the model homes, Taylor also uses photographs of its model homes in its brochures and on its website.

Defendant Eric Benfield registered the internet domain name "www.TaylorHomes-Ripoff.com."[1] The website, which Benfield refers to as a "gripe site," contained a prominent header stating: "Taylor Homes Ripoffs. Badly Fingering Your Dreams. Taylor sold us a quality home and gave us garbage!" (Affidavit of Chris Taylor, doc. 21, Ex. I.)[2] The website included one photograph of a Taylor model home, located in Florence, Kentucky, and several photographs of a home located in Clermont County, Ohio, that Taylor was constructing for Eric Benfield's parents, Mary and Marvin Benfield (the "Benfields"). (*Id*.; doc. 15 at 1.) Below the website's header and the first two photographs was the following statement: "Now let me show you a few details of their 'fine workmanship.'" (Doc. 21, Ex. I.) Below were numerous photos taken by Marvin Benfield of certain aspects of the Clermont County home. Among the photos were the following statements: "The 'brick' pictures, shown here, show the final insult to our sensibilities, and left no hope getting the building we were promised before we signed with Taylor Homes";

---

[1] The internet service provider, once a party to this lawsuit but voluntarily dismissed by Taylor in June 2005, unilaterally deactivated the website shortly after Taylor filed this lawsuit. (Doc. 12; Affidavit of Eric Benfield, attached to doc. 13, ¶12.) The website has not been in operation since approximately November 2004. (Benfield Aff. ¶ 13.)

[2] Chris Taylor's affidavit was originally filed as Document 16 but was missing certain attachments. The affidavit and all supporting attachments were refiled as Document 21.

and "'All materials and workmanship are within standard building tolerances,' explained the building supervisor." (*Id*.)

From the main web page, a viewer could click on links to three "galleries of photos" concerning "The Brick Work," "Mold," and "General Construction." (*Id*.) The Brick Work gallery contained several photos of the Clermont County home and the following statement: "A few pictures of the brick work on the house. We are not satisfied with this work, but were given no means for correcting the issue." The Mold gallery likewise contained several photos and the statement, "[t]he house was left in a condition that was conducive to mold growth. The house has been inspected and currently isn't safe for human habitation." (*Id*.) Finally, the General Construction gallery contained several photos and the statement, "[p]ictures of a few other aspects of the construction that we feel are substandard." (*Id*.)

The Benfields complained to Taylor about what they believed were code violations and workmanship problems and, in a letter prepared by their attorney dated July 24, 2003, demanded that Taylor stop work on the residence. (Doc. 16, ex. B.) At the time Taylor filed this lawsuit, the residence was not complete and, therefore, was not eligible for a certificate of occupancy. (Taylor Aff., doc. 16, ¶ 12.)

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.

The defendant has the burden of proof on all affirmative defenses.  *Fonseca v. Consolidated Rail Corp.*, 246 F.3d 585, 590 (6th Cir. 2001).  Thus, a party moving for summary judgment on the basis of an affirmative defense cannot carry the burden merely by pointing to the absence of evidence supporting the non-moving party's claim but must demonstrate that there are no genuine issues of material fact concerning the elements of the affirmative defense. *See*, *e.g.*, *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006).

## III.    ANALYSIS

### A.    Libel

Benfield makes three arguments for why he is entitled to summary judgment on Taylor's libel claim.  First, he argues that Taylor cannot demonstrate the prima facie elements of the cause of action because the statements on the website were not defamatory and there is no admissible

4

evidence of damages. (Doc. 18 at 2.) Second, Benfield argues that, even if Taylor could establish the requisite elements of libel, he is entitled to the defense of qualified privilege. (Doc. 13 at 6.) Finally, Benfield argues that the statements are opinion, not fact, and that statements of opinion are not actionable but are protected by the Ohio Constitution. (Doc. 13 at 8.)

In Ohio, libel is defined as "a false written publication, made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council,* 73 Ohio St. 3d 1, 7, 651 N.E.2d 1283, 1289 (1995) (citations omitted). Ohio courts hold that a plaintiff alleging a claim for libel must demonstrate the following elements: (1) a false statement of fact was made concerning the plaintiff; (2) the statement was defamatory towards the plaintiff; (3) the statement was written; (4) the statement was published; and (5) in publishing the statement, the defendant acted with the necessary degree of fault. *Gupta v. The Lima News,* 139 Ohio App. 3d 538, 544, 744 N.E.2d 1207, 1211 (2000). The comments on Benfield's website were obviously written and published, thus the Court must inquire as to whether the statements were false, whether they were defamatory, and whether Benfield acted with the necessary degree of fault when he published the statements.

### 1. Falsity

Taylor claims that the following statements/photographs published on the website were false or misleading: (1) "'All materials and workmanship are within standard building tolerances,' explained the building supervisor"; (2) "The house was left in a condition that was conducive to mold growth"; (3) "The house has been inspected and currently isn't safe for

human habitation"; (4) "We are not satisfied with this [brick] work, but were given no means for correcting the issue"; and (5) the photographs on the website mislead a reader into thinking that the photographs represent Taylor's final work. (Doc. 15 at 5-8.)

"It is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation." *Natl. Medic Serv. Corp. v. E.W. Scripps Co.*, 61 Ohio App. 3d 752, 755, 573 N.E.2d 1148, 1150 (Ohio App. 1989) (quoting Prosser, Law of Torts (4 Ed.1971) 798-799). Thus, the Court must ascertain whether the statements posted on Benfield's website were "substantially true." *Id.*

First, the statement concerning the brick work that "'[a]ll materials and workmanship are within standard building tolerances,' explained the building supervisor," is substantially true. Benfield gleaned this statement from an inspection report prepared by an independent engineer at the request of Taylor's attorney. (Doc. 16, Ex. C.) While the statement is not an accurate quote (the report states that "the west wall has been installed in accordance with the tolerances associated with good construction practice") and is improperly attributed to a Taylor building supervisor rather than an engineer hired by Taylor, the gist of the statement–that Taylor's position was that the brick work was done in accordance with standard building tolerances–is true.

Similarly, the statement that "[t]he house was left in a condition that was conducive to mold growth" is substantially true. Taylor contends that the statement leads the reader to believe that Taylor abandoned the work or claimed to have completed the work leaving the mold. Taylor's argument strays from the concise analysis required, that is, whether the statement itself

is true. That the house was left in a condition that was conducive to mold growth–even if temporarily–is demonstrated by the inspection reports prepared at the request of both the Benfields and Taylor. The report prepared at the request of the Benfields, based on a July 9, 2003 inspection, noted "mold-like growth in various locations" in the crawl space (doc. 16, ex. D, at 4); and the report prepared at the request of Taylor, based on a November 17, 2003 inspection, noted "widespread fungal growth on most surfaces" (doc. 16, ex. E, at 3). While Taylor contends that Taylor did not voluntarily "leave" this condition but that the Benfields ordered it to cease work on the property, the evidence shows that the Benfields did not demand that Taylor stop work until July 24, 2003–more than two weeks after the inspector hired by the Benfields discovered mold growth in the crawl space. (*See* doc. 16, ex. B.) Thus, the property "was left in a condition that was conducive to mold growth" prior to the time the Benfields told Taylor to stop work on the residence.[3]

The third challenged statement, that the house "isn't safe for human habitation," on the other hand, is more misleading than true. The Court's review of the provided inspection reports did not reveal any verifiable statement that the house was not safe for human habitation because of the mold. Indeed, Benfield in his Reply Memorandum does not argue that the statement was true but rather claims that the "statements of whether the home was in livable condition or garbage are clearly statements of opinion." (Doc. 18 at 2.) Statements of opinion are protected by Section 11, Article I of the Ohio Constitution. *Vail v. Plain Dealer Publishing Co.*, 72 Ohio

---

[3] Neither does the evidence show, as Taylor suggests, that the "condition" that lead to the mold growth was entirely the result of the Benfields' failure to carry out their own responsibility under the contract, namely, to properly grade the soil. To the contrary, the inspection report listed several conditions that contributed to the mold growth in addition to the grading of the soil, including inadequate crawl space ventilation and the placement of a drain pipe that penetrated the building footing. (*See* doc. 16, ex. D, at 4.)

St. 3d 279, 280, 649 N.E.2d 182 (1995) (citing *Scott v. News-Herald*, 25 Ohio St. 3d 243, 244-45, 496 N.E.2d 699 (1986)). The applicability of the "opinion privilege" in a given case is a matter of law for the court. *Wampler v. Higgins*, 93 Ohio St. 3d 111, 127, 752 N.E.2d 962 (2001).

To determine whether a published statement constitutes a protected opinion, the Court must examine the "totality of the circumstances." *Wampler*, 93 Ohio St. 3d at 115. Consideration of the totality of the circumstances involves four factors: (1) specific language used, (2) whether the statement is verifiable, (3) general context of the statement, and (4) the broader context in which the statement appeared. *Id.* at 126. The specific language in issue here, that "[t]he house has been inspected and currently isn't safe for human habitation," is unambiguous, and a reasonable reader would view the words to be language that normally conveys information of a factual nature. *Cf. Vail*, 72 Ohio St. 3d at 282-83 (finding that the language "anti-homophobic diatribe" and "homophobia" lacked precise meaning and was therefore opinion language). The statement also is one which is verifiable, thus lending to a conclusion that it is one of fact and not opinion. Finally, both the general and broader context in which the statement was made–a website containing photographs of and statements concerning allegedly shoddy home construction–do not plainly impart to a reader that the statement should be read as one of opinion as opposed to fact. *Cf. Vail*, 72 Ohio St. 3d at 282 (finding that a column that appeared on the Forum page of the newspaper and titled "Commentary" gave a reader the message that the column would convey the personal opinion of the writer, as distinguished from a news story). Given the totality of the circumstances, the Court finds that

the statement is not one of opinion and is substantially misleading, making it actionable absent some privilege.

The fourth contested statement, that the Benfields "were given no means for correcting the [brick work] issue," is also false. The contract between the parties gave the Benfields several options for "correcting the issue" of their dissatisfaction, including participating in mediation or arbitration or exercising the contract's "buy-back option," all of which the Benfields declined to do.[4]

Finally, with respect to the photographs of the residence posted on the website, the Court declines to hold that the photographs themselves constituted false statements within the context of a libel claim. Rather, the Court finds it more appropriate to consider the photographs in conjunction with the accompanying text in discerning whether, under the totality of the circumstances, the statements were fact or opinion. *See Vail*, 72 Ohio St.3d at 282. To summarize, the Court concludes that Benfield's statements "[t]he house has been inspected and currently isn't safe for human habitation" and "[w]e are not satisfied with this [brick] work, but were given no means for correcting the issue" were factual statements that were false.

### 2. Defamatory

The second step in analyzing a libel claim is determining whether the statements are defamatory. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Gupta*, 139 Ohio App. 3d at 546, 744 N.E.2d at 1212 (quoting 3 Restatement

---

[4] Taylor sent the Benfields and their counsel a demand for mediation on November 24, 2003, to which the Benfields never replied (doc. 16, ex. G), and Taylor apparently offered to purchase the property from the Benfields under the "buy back" option (*see* doc. 15 at 8).

of the Law 2d, Torts (1977) 156, Section 559). There are two types of defamatory publications in Ohio: a publication may be defamatory on its face (defamatory *per se*) or capable of being interpreted as defamatory (defamatory *per quod*). *Id.* "A publication is defamatory *per se* if, on its face, it reflects upon a person's character . . . in a manner that will harm the person in his or her trade or profession." *Id.* "When a writing is not ambiguous, the question of whether it is libelous *per se* is a question of law for the court." *Id.*

Ohio courts have observed that false statements causing injury to a professional's reputation are generally defamatory *per se*. *Id.* at 547 (citing *Godsen v. Louis*, 116 Ohio App. 3d 195, 687 N.E.2d 481 (Ohio App. 1996)). Both of the false statements posted on Benfield's website, that the house was not safe for habitation and that the Benfields were given no means for correcting the issues with the brick work, are injurious to Taylor's professional reputation as a builder as they impute to Taylor both a lack of skill and a reluctance to address consumer concerns. Accordingly, in keeping with Ohio precedent, the Court concludes that the false statements were defamatory *per se*.

### 3. Necessary Degree of Fault

The requisite degree of fault that a party alleging libel must show depends on the nature of the plaintiff. There are four classifications for a plaintiff who alleges defamation: "(1) a private person; (2) a public official; (3) a public figure; and (4) a limited purpose public figure." *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App. 3d 413, 421, 755 N.E.2d 976, 982-83 (Ohio App. 2001). There are no facts in the record to indicate that Taylor is anything other than a private figure. Unlike a public figure plaintiff, which must demonstrate that the defendant acted with actual malice, a private plaintiff need only show that the defendant was at

least negligent in publishing the false statement.  *Id.* (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 766 (1985)).  To make such a showing, the plaintiff must prove that the defendant did not act reasonably in attempting to discover the truth or falsity of the publication.  *Franks v. The Lima News*, 109 Ohio App.3d 408, 412, 672 N.E.2d 245, 248 (Ohio App. 1996) (citing *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987)).

When Benfield posted the statement on his website that the house was not safe for habitation because of the mold, he did not base it on the report of the industrial hygienist who conducted a mold analysis of the property.[5]  Furthermore, the statement failed to acknowledge that Taylor solicited two quotes for mold remediation but that the Benfields did not allow Taylor to proceed with the remedial work.  (*See* doc. 16, ex. F.)  Viewing the evidence most strongly in the favor of the non-moving party, the Court finds that there is a genuine issue of material fact as to whether Benfield acted reasonably in attempting to discover the truth or falsity of the published statements.  Because Taylor has alleged facts sufficient to show that at least two of the statements posted on Benfield's website satisfy the elements of libel, the Court must proceed to determine whether Benfield can show that he is entitled to judgment based on the affirmative defense of privilege.

### 4.  Privilege

The defendant in a libel action may invoke the defense of  "qualified privilege."  *Hahn v. Kotten*, 43 Ohio St. 2d 237, 243, 331 N.E.2d 713, 718 (1975).  A publication is privileged when

---

[5]  The industrial hygienist provided his report to the Benfields on December 5, 2003. (*See* doc. 16, ¶ 7.)  He did not render an opinion that the house was unsafe for habitation because of the mold.  (*See* doc. 16, ex. E.)

11

it is "fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned." *Id*. at 244. The essential elements of a privileged communication are as follows: (1) good faith, (2) an interest to be upheld,[6] (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only. *Id*. The determination of whether the privilege applies is a question of law for the court. *A & B-Abell Elevator Co.*, 73 Ohio St. 3d 1, 7, 651 N.E.2d 1283, 1290.

Benfield has failed to set forth evidence sufficient to demonstrate that he is entitled to judgment on at least one element of the privilege defense: that the publication was made in a proper manner and to proper parties only. As Taylor points out, Benfield himself was not a party to the contract with Taylor; his parents were. Thus, Benfield did not have a private interest to uphold in the matter but rather was pursing a public interest. Benfield concedes this point, explaining that he felt he had "a duty to other people who might decide that they would have [Taylor] build a home for them." (Benfield Affidavit, doc. 13-2, ¶ 16.) To qualify for the public interest privilege, a communication must be made "to those who may be expected to take official action of some kind for the protection of some interest of the public." *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 9 (quoting Prosser & Keeton, The Law of Torts (5 Ed. 1984) 830, Sec. 115.). For example, in *A & B-Abell*, the plaintiff sued the defendant for defamation after the defendant provided information to government officials in connection with the plaintiff's qualifications as a bidder on a public-works contract. *Id*. at 7. The Ohio Supreme Court found that the

---

[6] "One type of interest protected by a qualified privilege is the public interest." *A & B-Abell Elevator Co.*, 73 Ohio St. 3d at 9, 651 N.E.2d at 1291.

12

communication was in the public interest and thus protected by qualified privilege, explaining

that

> [t]he public has an interest in ensuring that only competent,
> reliable and responsible contractors receive public work,
> particularly when the work affects the public's safety.  Because of
> this interest, it is the right of every citizen to communicate with his
> or her government and its officers on matters that affect the
> discharge of their duties in this regard . . . .  Public policy dictates,
> therefore, that those who provide information to government
> officials who may be expected to take action with regard to the
> qualifications of bidders for public-work contracts be given a
> qualified privilege. . ..

*Id*. at 9-10.  Because the defendant's communications were made in connection with the

circumstances surrounding the bidding and procurement of public-work contracts, were limited

in scope to matters that reflected on the plaintiff's qualifications to perform the work in a safe

and reliable manner, and were made only to those public officials who were expected to take

action for the protection of the public interest, the communication was entitled to qualified

privilege.  *Id*. at 10.

The instant matter is factually distinct from *A & B-Abell*: although Benfield asserts that

he posted the comments on the website because of the public's interest in knowing his

complaints about Taylor, the communication was not "made to those who may be expected to

take official action of some kind for the protection of some interest of the public" as is required

for a communication to qualify for the public interest privilege.  *Id*. at 9.  Because Benfield has

failed to demonstrate that he is entitled to judgment as a matter of law on the issue of qualified

privilege, he is not entitled to summary judgment on that affirmative defense to libel.

Furthermore, the Court having concluded that the statements "The house has been inspected and

currently isn't safe for human habitation" and "We are not satisfied with this [brick] work, but

13

were given no means for correcting the issue" were libelous *per se* and that there is an issue of fact as to whether Benfield acted with the requisite degree of fault, Taylor is entitled to pursue its claim for libel arising out of those statements.

**B.     Interference with Business Relationships and Contracts**

The torts of interference with business relationships and contract rights occur when a person, without privilege to do so, induces or otherwise causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another. *A & B-Abell*, 73 Ohio St.3d at 14, 651 N.E.2d at 1294. Taylor captioned the third count of its complaint "Tortious Interference with Contract/Business Relations." However, the claims of tortious interference with business relations and tortious interference with contract rights are two distinct claims. *Super Sulky, Inc. v. U.S. Trotting Assen*, 174 F.3d 733, 741 (6th Cir. 1999).

Tortious interference with a contract requires proof of the following elements: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification or privilege; and (5) resulting damages. *Franklin Tractor Sales v. New Holland North America, Inc.*, 106 Fed. App'x 342, 344 n. 1, 2004 WL 1770556 at **1 (6th Cir. 2004) (citing *Fred Siegel Co. v. Arter & Hadden*, 85 Ohio St. 3d 171, 171-72, 707 N.E.2d 853, 855 (1999)).

The tort of interference with a business relationship "has similar elements, but occurs when the result of the improper interference is not the breach of a contract, but the refusal of a third party to enter into or continue a business relationship with the plaintiff." *Id*.; *see also Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 148 Ohio App. 3d 596, 604, 774 N.E.2d 775, 780 (Ohio App. 2002) ("The elements of tortious interference with a business

14

relationship are (1) a business relationship, (2) the tortfeasor's knowledge thereof, (3) an intentional interference causing a breach or termination of the relationship, and, (4) damages resulting therefrom.")

The only evidence relevant to this claim that Taylor tendered in response to Benfield's motion for summary judgment was the affidavit of Chris Taylor, President and Chief Operating Officer of Taylor.  (Doc. 16.)  In his affidavit, Taylor states that "[a]s the result of the distribution of false information on the Benfield Website, a separate Taylor customer refused to carry out the terms of a previously executed Construction Agreement."  (Doc. 16 ¶ 13.)  Taylor did not provide any evidence to support a finding that Benfield knew of the contract between Taylor and the unnamed customer, nor that Benfield intentionally procured the contract's breach. Thus, there is no issue of material fact on the claim of intentional interference with contract, and Benfield is entitled to summary judgment on that claim.

Neither does Taylor's affidavit create a genuine issue of material fact as to the claim of intentional interference with business relations.  Taylor did not assert that Benfield knew of any business relationship between Taylor and the unnamed customer or intentionally caused the termination of that relationship.  Neither is Taylor's sworn statement that the unnamed customer refused to carry out the terms of a construction agreement sufficient to demonstrate a triable issue concerning damages.  As noted by the court in *Thomas v. Ametech*:

> [Federal Rule of Civil Procedure] 56(e) requires that affidavits "set forth such facts as would be admissible at trial."  Conclusory affidavits cannot be used to create a question of fact.  *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584-85 (6th Cir. 1992).  At the summary judgment stage, a court may only consider affidavits that are based upon personal knowledge.  *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005).

15

464 F. Supp. 2d 688, 695 (N.D. Ohio 2006). Taylor's statement relaying the customer's

position–that the customer refused to carry out the terms of the agreement as a result of the

information posted on the website–is hearsay under Federal Rule of Evidence Rule 801 and is

not admissible as evidence under any exception. *See* Fed. R. Evid. 802. Accordingly, Taylor

has failed to demonstrate that a genuine issue of fact exists as to its intentional interference with

contract/business relations claims, and summary judgment in Benfield's favor on those claims is

appropriate.[7]

### C. Trade Dress Infringement

Taylor claims that Benfield made use of a mark on the website which was purposefully

and deceptively similar to the service mark used by Taylor, that the website's appearance

approximated Taylor's website in its image and overall impression, and that Benfield designed

the website and domain name for the purpose of creating actual confusion between Taylor's

website and Benfield's website. Benfield asserts in his motion for summary judgment that the

Sixth Circuit has determined that internet "gripe sites" such as the one he created–which are non-

commercial and which implement plainly derogatory terms in the domain name–do not violate

the Lanham Act. The Court agrees.

Section 43(a) of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any word,
> term, name, symbol, or device, or any combination thereof, or any

---

[7] Because Taylor failed to demonstrate an issue of fact as to Benfield's knowledge of any contract or business relationship between the unnamed customer and Taylor, the Court need not engage in an analysis of whether Benfield was privileged to interfere with that contract/relationship. *See Franklin Tractor Sales*, 106 Fed. App'x at 344 (discussing that one of the key elements in a tortious interference claim is whether the defendant's actions were privileged).

> false designation of origin, false or misleading description of fact,
> or false or misleading representation of fact, which--(A) is likely to
> cause confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person with another
> person, or as to the origin, sponsorship, or approval of his or her
> goods, services, or commercial activities by another person . . .
> shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125. Section 43(a) protects from infringement the unregistered "trade dress" of a

product. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000). To prevail under a

cause of action brought under Section 43(a), a plaintiff must prove five elements: (1) that it

possesses a mark; (2) that the opposing party used the mark; (3) that the opposing party's use of

the mark occurred "in commerce"; (4) that the opposing party used the mark "in connection with

the sale, offering for sale, distribution, or advertising" of goods or services; and (5) that the

opposing party used the mark in a manner likely to confuse customers. *Lamparello v. Falwell*,

420 F.3d 309, 313 (4th Cir. 2005). In addition, to recover for trade dress infringement,[8] a party

must prove by a preponderance of the evidence: (1) that the trade dress in question is distinctive

in the marketplace, thereby indicating the source of the good it dresses, (2) that the trade dress is

primarily nonfunctional, and (3) that the trade dress of the competing good is confusingly

similar. *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 629

(6th Cir. 2002) (citing *Samara Bros.*, 529 U.S. at 210 (2000)).

Taylor sets forth three specific arguments meant to demonstrate that summary judgment

for Benfield on this claim is improper. First, it claims that Benfield's use of the words "Taylor

---

[8] Although Taylor captioned the third count of its Complaint "Misappropriation of
Service Mark and Trade Dress," the allegations of the complaint (doc. 1 ¶¶ 27-38) and Taylor's
memorandum in opposition to Benfield's motion for summary judgment (doc. 15 at 14-21)
demonstrate that the claim is one of trade dress infringement.

17

Homes" and the accompanying image–an outstretched hand with the thumb and forefinger around the letter T–is confusingly similar to the service mark employed by Taylor on its website–which is the word "Taylor" with a series of curving lines which extend over the top of the T.  Second, it claims that Benfield's website is an instrumentality of commerce and is therefore subject to the Lanham Act.  Finally, it argues that the Benfield website is likely to cause "initial interest" or "source" confusion by guiding a searcher to its website rather than the actual Taylor website.

With respect to the first argument, the Court finds that Benfield did not use the Taylor mark in a manner likely to confuse customers.  A side-by-side comparison of the images on Benfield's website (doc. 16, ex. I) and the Taylor Homes mark (doc. 16, ex. J) do not reveal any similarities other than the use of the word "Taylor."  The typeface of the word "Taylor"on Benfield's website is in lower case and uses a bold, sans-serif type; and the letter T has a white, angled line in the top bar which resembles a roof line.  The Taylor mark, on the other hand, employs a stylized bold-faced letter T flanked by three thick curved lines, and the remaining letters are all capitals in a plain, serif typeface.  The Benfield website also states "Taylor Homes" while the actual Taylor mark states "Taylor Building Corporation of America."  Perhaps most significant, the words "Taylor Homes" on Benfield's website are accompanied by the phrase "Badly Fingering Your Dreams" and "Ripoffs," plainly demonstrating that his is not a website sponsored by Taylor.  Simply put, reasonable minds could come to but one conclusion on this issue: that there is no likelihood of confusion between Benfield's use of the word "Taylor" and Taylor's mark.

18

Neither is Taylor's second assertion, that Benfield's website is an instrumentality of commerce for the purposes of a Lanham Act claim, sufficient to demonstrate a triable issue as to its Lanham Act claim. Taylor relies largely on an unreported 1997 case decided by the Southern District of New York for its finding that "establishing a typical home page on the Internet, for access to all users, would satisfy the Lanham Act's 'in commerce' requirement.'" *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 133313 at *3 (S.D.N.Y. 1997). However, the Sixth Circuit has addressed *Planned Parenthood* and did not adopt its conclusion. To the contrary, the Sixth Circuit concluded that a cybergriping site with a domain name that included the phrase "sucks.com" and which had no commercial purpose but rather provided running editorial on a conflict between the website creator and the plaintiff corporation did not create any possibility of confusion and did not violate the Lanham Act. *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003).

In *Taubman*, the Sixth Circuit concluded that the domain name "taubmansucks.com" was purely an exhibition of Free Speech, and the Lanham Act was not invoked, even though economic damage might have been an intended effect of the defendant's expression. *Id*. at 778.[9] The Fourth Circuit has come to a similar conclusion upon review of a matter with numerous common elements. In *Lamparello v. Falwell*, the Fourth Circuit concluded that

---

[9] Taylor argues that *Taubman* is of little guidance because the court in that case was considering an appeal from a preliminary injunction and that Taylor is not seeing injunctive relief in this case. This procedural distinction is not material. While it is true that the *Taubman* court engaged in an analysis of whether the plaintiff in that case was likely to succeed on his Lanham Act claim, its determination that the gripe site did not violate the Lanham Act required a review of the merits of the claim. Its conclusion is therefore applicable to the instant matter. Taylor's position that *Taubman* is inapplicable also rings disingenuous as the *Planned Parenthood* case on which it relies as support for its argument on the same topic, 1997 WL 133313 (S.D.N.Y 1997), also concerns injunctive relief.

19

www.fallwell.com, a website created by the plaintiff that criticized the views of Reverend Jerry

Falwell, was not infringing upon www.falwell.com, the website of Jerry Falwell Ministries.  420

F.3d 309 (4th Cir. 2005).  Lamparello never sold any goods or services on his website but used

the site "to respond to what he believed were 'untruths about gay people.'"  *Id*. at 311.  The court

found there was no likelihood of confusion between the gripe site and Falwell's site, noting that

"[a]fter even a quick glance at the content of the [allegedly infringing website] . . . , no one

seeking Reverend Falwell's guidance would be misled by the domain name . . . into believing

Reverend Falwell authorized the content of that website.  No one would believe that Reverend

Falwell sponsored a site criticizing himself, his positions, and his interpretations of the Bible."

*Id*. at 315.

Benfield clearly hoped to drive customers away from Taylor by posting his complaints

about the home builder.  Thus, it is arguable that he intended to cause Taylor economic harm.

However, in keeping with the logic of *Taubman* and *Lamparello*, the Court concludes that, even

if Benfield's use of the website was commercial, his website was a forum for criticizing the

builder.  Accordingly, there is no likelihood of confusion and, thus, no Lanham Act violation.

*See*, *e.g.*, *Taubman*, 310 F.3d at 777-78.

Finally, the Court rejects Taylor's argument that Benfield's website creates "source

confusion" or "initial interest confusion" and thus violates the Lanham Act.  The Sixth Circuit

has recognized that a likelihood of initial-interest confusion may render a defendant liable under

the Lanham Act.  *See Stilson & Associates, Inc. v. Stilson Consulting Group, LLC*, 129 Fed.

App'x 993, 999 (6th Cir. 2005).  However, "[w]here confusion has little or no meaningful effect

in the marketplace, it is of little or no consequence in our analysis." *Id*. at 998 (quoting

20

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 297 (3d Cir. 2001)).
Benfield's website contained no commercial content, provided no links to commercial websites,
and offered no products or services for sale on the website.  (Benfield Aff., doc. 13-2, ¶¶ 2-4.)
Because the site did not sell products or services or direct consumers to other vendors, any initial
confusion would have had little or no meaningful effect in the marketplace.  Furthermore,
Taylor's argument that "innocent searchers may come upon [Benfield's] website believing that
they have located Taylor Homes" (doc. 15 at 19) is untenable given that the address of
Benfield's website is "TaylorHomes-Ripoff.com."  No one seeking Taylor's website would
think–even momentarily–that Taylor in fact sponsored a website that included the word "ripoff"
in its website address.

Because Taylor has failed to demonstrate that a genuine issue of material fact exists with
respect to the predicate elements of a claim under Section 43(a) of the Lanham Act, the Court
need not inquire into whether it can demonstrate the remaining elements of a claim of trade dress
infringement.  Summary judgment in Benfield's favor is thus proper on Taylor's third claim for
relief.

## IV.	CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART**
Defendant's Motion for Summary Judgment.  Summary Judgment in Defendant's favor is
GRANTED on Counts II and III of Plaintiff's complaint and DENIED on Count I of the
complaint insofar as it asserts a claim of libel arising out of the statements "The house has been
inspected and currently isn't safe for human habitation" and "We are not satisfied with this

21

[brick] work, but were given no means for correcting the issue." The matter shall proceed on Plaintiff's libel claim and Defendant's counterclaims.

**IT IS SO ORDERED.**


_____s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge